In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1741
OMAR HERNANDEZ, individually and on behalf of all others
similarly situated,
 Plaintiff-Appellant,

 v.

ILLINOIS INSTITUTE OF TECHNOLOGY,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 20-cv-3010 — Franklin U. Valderrama, Judge.
 ____________________

 ARGUED SEPTEMBER 30, 2022 — DECIDED MARCH 27, 2023
 ____________________

 Before WOOD, ST. EVE, and KIRSCH, Circuit Judges.
 WOOD, Circuit Judge. Omar Hernandez seeks a partial re-
fund of the tuition and fees he (along with the members of the
classes he would like to represent) paid to the Illinois Institute
of Technology for the Spring 2020 semester. In March 2020,
IIT halted in-person classes, switched to all-online instruction,
and restricted access to its campus and facilities for the re-
mainder of the semester in response to the COVID-19
2 No. 22-1741

pandemic. Finding no meaningful distinctions between his
case and Gociman v. Loyola University of Chicago, 41 F.4th 873
(7th Cir. 2022), we hold that Hernandez has alleged enough
to go forward. We reverse the district court’s dismissal of the
case and remand for further proceedings.
 I
 Illinois Institute of Technology is a nonproﬁt higher edu-
cation institution with campuses in Chicago and Wheaton, Il-
linois. At the outset of the COVID-19 pandemic in March 2020,
like practically every other college and university, IIT sus-
pended all in-person instruction, moved all classes online,
and restricted access to campus facilities. IIT did not refund
tuition or mandatory fees to its students.
 Hernandez, a student who paid tuition and fees for the
Spring 2020 semester, ﬁled this lawsuit against IIT. He relied
on the court’s jurisdiction under the Class Action Fairness
Act, 28 U.S.C. § 1332(d), because minimal diversity existed,
there were more than 100 class members, and the amount in
controversy exceeds $5,000,000. (Both Hernandez and IIT are
citizens of Illinois, but the statute conﬁrms that this does not
defeat jurisdiction, which is ascertained as of the date of ﬁling.
See 28 U.S.C. § 1332(d)(7).) He invokes two theories in his
quest for damages from IIT. First, he alleges that an express
or implied contract was formed, under which the university
promised to provide in-person instruction, services, and
resources, in exchange for the student’s payment of tuition
and compulsory fees. He singles out certain of these fees,
including Activity Fees, Student Services Fees, Professional
Co-Curricular Fees, and Studio Fees. The university, he
contends, breached this contract. His complaint also raises an
No. 22-1741 3

unjust enrichment theory, based on the university’s retention
of students’ full tuition and fees.
 Hernandez’s complaint relies on pre-pandemic IIT mate-
rials that are replete with references to in-person, on-campus
instruction, as well as to IIT’s past practice of providing in-
person, on-campus education. For example, IIT encouraged
prospective students to “picture [themselves] on campus”
where they would “live, eat, learn, and play,” and it adver-
tised “hands-on programs” with “face-to-face interaction
with professors, mentors, and peers.” The online course reg-
istration portal speciﬁed whether a course would be taught
online or by the “traditional instruction method,” i.e., in per-
son. Notably, IIT oﬀered separate graduate-level “distance
education degree and certiﬁcate programs,” but it did not of-
fer a fully online option for all graduate degree programs, nor
did it do so for undergraduate students. Indeed, undergrad-
uate students were not permitted to register for an online class
without special approval. IIT also required undergraduate
students to live on campus for two years unless they sought
and received an exemption.
 IIT argues that these materials and past practices do not
amount to an identiﬁable and enforceable promise, either ex-
press or implied, to provide in-person, on-campus instruc-
tion. It further contends that Hernandez’s claims are fore-
closed by its tuition-refund policy. Finally, IIT contends that
Hernandez is really asserting a claim of educational malprac-
tice, but Illinois has not recognized any such cause of action.
 The district court granted IIT’s motion under Federal Rule
of Civil Procedure 12(b)(6) to dismiss all counts for failure to
state a claim. In so doing, however, it rejected IIT’s
educational malpractice argument. It found instead that
4 No. 22-1741

Hernandez failed to identify any promise to provide in-
person, on-campus instruction that was speciﬁc enough to
support an express or implied breach-of-contract claim. The
court also held that Hernandez failed to state a claim for
unjust enrichment, because his Second Amended Complaint
incorporated his allegations of an enforceable contract in the
unjust enrichment count, and the two cannot coexist. The
court declined to reach the class certiﬁcation issue.
 While this appeal was pending, we decided Gociman v.
Loyola University of Chicago, 41 F.4th 873 (7th Cir. 2022), which
involved similar claims brought by Loyola students aﬀected
by the pandemic. There we held that the plaintiﬀ students ad-
equately stated claims for breach of an implied contract under
Illinois law, and that their claims were not educational mal-
practice complaints in disguise. We rejected the argument that
there was an express contract between Loyola and the stu-
dents.
 II
 We approach a dismissal for failure to state a claim de novo,
accepting all well-pleaded facts as true and drawing all rea-
sonable inferences in favor of the plaintiff. Crescent Plaza Hotel
Owner, L.P. v. Zurich Am. Ins. Co., 20 F.4th 303, 308 (7th Cir.
2021).
 Illinois law governs the scope of IIT’s obligations to its stu-
dents. We must do our best to apply that law to the unprece-
dented disruption of traditional university operations caused
by the COVID-19 pandemic. In these circumstances, we “use
our own best judgment to estimate how the [Illinois] Supreme
Court would rule as to its law,” affording due consideration
No. 22-1741 5

to intermediate state court decisions. Zahn v. N. Am. Power &
Gas, LLC, 815 F.3d 1082, 1087–88 (7th Cir. 2016).
 Some basic principles are well established. First, Illinois
courts have recognized that the student-university relation-
ship is contractual in nature, though it is not a perfect ana-
logue to “traditional, commercial contracts.” Bosch v.
NorthShore Univ. Health Sys., 2019 IL App (1st) 190070, ¶¶ 29–
30. Second, like any party to a contract, a student may sue if a
university breaches a contractual promise. See, e.g., Steinberg
v. Chi. Med. Sch., 69 Ill. 2d 320, 332 (Ill. 1977) (“A contract be-
tween a private institution and a student confers duties upon
both parties which cannot be arbitrarily disregarded and may
be judicially enforced.” (quoting DeMarco v. Univ. of Health
Scis./Chi. Med. Sch., 40 Ill. App. 3d 474, 480 (Ill. App. Ct.
1976))). And third, distinctively, universities are generally
shielded from suits that require courts to evaluate the quality
of a student’s education or to second-guess a university’s ac-
ademic decisions, even if such suits are styled as breach-of-
contract actions. See Bosch, 2019 IL App (1st) 190070, ¶ 37 (dis-
cussing Illinois courts’ deference to universities “with respect
to the establishment, maintenance, and enforcement of aca-
demic standards”). With these principles in mind, we evalu-
ate whether Hernandez has stated a claim for breach of con-
tract or unjust enrichment.
 A. Breach of Contract
 To state a claim for breach of contract in Illinois, a plaintiff
must plead: “(1) the existence of a valid and enforceable con-
tract; (2) substantial performance by the plaintiff; (3) a breach
by the defendant; and (4) damages.” Gociman, 41 F.4th at 883
(citing Babbitt Muns., Inc. v. Health Care Serv. Corp., 2016 IL
App (1st) 152662, ¶ 27). Under Illinois law, “the only
6 No. 22-1741

difference between an express contract and an implied con-
tract is that an implied contract is inferred from the facts and
conduct of the parties, rather than from an oral or written
agreement.” BMO Harris Bank, N.A. v. Porter, 2018 IL App
(1st) 171308, ¶ 52. We note that in this context, the state courts
are speaking of a contract that is implied in fact, not a contract
implied in law. The latter theory arises when there is no con-
tract, either express or implied in fact, but where an equitable
doctrine such as unjust enrichment might be available. See
Marcatante v. City of Chicago, 657 F.3d 433, 442 (7th Cir. 2011)
(“Unlike contracts implied in fact, contracts implied in law
arise notwithstanding the parties’ intentions and are no con-
tracts at all. They are instead governed by equitable princi-
ples.” (internal citations omitted)).
 Even absent a formal document signed by both the univer-
sity and the student, with the word “Contract” at the top of
the page, “a student may establish that an implied contract
existed between himself and the university that entitled the
student to a specific right, such as the right to a continuing
education or the right not to be suspended without good
cause.” Bissessur v. Indiana Univ. Bd. of Trustees, 581 F.3d 599,
601 (7th Cir. 2009). The school’s customs, conduct, and mate-
rials such as “catalogs, bulletins, circulars, regulations, and
other publications” may support an implied contract and its
terms—provided that they evidence an intent to be bound.
Gociman, 41 F.4th at 883.
 This means that in order to survive dismissal, Hernandez
had to allege plausibly that IIT promised to provide in-person
instruction and access to campus facilities in exchange for his
tuition and fees. He may do so either by pointing to a written
or oral agreement that states as much (an express contract), or
No. 22-1741 7

by showing that an identifiable contractual promise can be in-
ferred from “the facts and conduct” of IIT (an implied con-
tract). BMO Harris Bank, 2018 IL App (1st) 171308, ¶ 52.
 To support his contract claims, Hernandez primarily relies
on IIT’s numerous references to in-person, on-campus in-
struction in its “website, academic catalogs, student hand-
books, correspondence, marketing materials and other circu-
lars, bulletins, and publications.” For example, IIT’s market-
ing materials touted the many facilities and resources on its
two campuses and encouraged prospective students to visit
campus “to see where you’ll learn, live, eat, and have fun.”
More importantly, its Academic Catalog and class registra-
tion portal differentiate between “Traditional” and “Online”
instruction, and “specifically prohibit traditional students
from registering for online classes, absent approval.” The uni-
versity also differentiates between its traditional programs
and its fully online programs, which were available for
some—but not all—of its degree programs. Finally, some
mandatory fees apply only to on-campus activities. For exam-
ple, there is an Activity Fee for “programs directly related to
campus activities …. [and] campus events.” And the required
Student Services Fees are earmarked to support “on-campus
departments such as Athletics, Paul V. Galvin Library, Career
Services, and Technology Services,” though some of those de-
partments might also be adapted to an online presence.
 These materials are similar to those on which the Loyola
University students in Gociman relied. But we did not accept
the Loyola students’ arguments in their entirety. We con-
cluded that their complaint could not support an express con-
tract theory, despite the references to in-person instruction in
“Loyola’s catalogs, registration portal, pre-pandemic practice,
8 No. 22-1741

and different charges for Loyola’s online versus on-campus
programs.” See Gociman, 41 F.4th at 884. Nevertheless, we
found that “taken as a whole, these sources are sufficient to
show an implied contract to provide in-person instruction
and access to Loyola’s campus in exchange for tuition and cer-
tain mandatory fees.” Id.
 Hernandez’s complaint is no more specific than the one in
Gociman for purposes of alleging an express contract. We
therefore conclude that it too does not suffice to allow him to
proceed on the theory that IIT entered into an express contract
to provide in-person instruction and access to physical facili-
ties in exchange for tuition and fees. As in Gociman, however,
the picture is different for a contract implied in fact. First, Her-
nandez did not need to spell out his legal theory in the com-
plaint; the Federal Rules of Civil Procedure do not require a
plaintiff to plead legal theories. See, e.g., Johnson v. City of
Shelby, 574 U.S. 10, 11 (2014) (per curiam); Bartholet v. Reishauer
A.G. (Zürich), 953 F.2d 1073, 1078 (7th Cir. 1992). Here, Her-
nandez has sufficiently alleged facts that plausibly suggest
the existence of an implied contract for in-person education
and access to physical facilities and resources. He alleged that
IIT has a long-established practice of providing in-person in-
struction and on-campus resources, and that IIT has consist-
ently indicated that the service it is selling is one that involves
an in-person, on-campus experience. These representations
appear in its website, course catalogue, and other official ma-
terials provided to current and prospective students. We con-
clude, just as we did in Gociman, that this suffices for the pre-
sent to support Hernandez’s claim that an identifiable con-
tractual promise to provide an in-person, on-campus univer-
sity experience in exchange for tuition and fees can be inferred
No. 22-1741 9

from “the facts and conduct” of IIT. BMO Harris Bank, 2018 IL
App (1st) 171308, ¶ 52.
 IIT argues that this case is distinguishable from Gociman
because, in contrast to the Loyola plaintiffs there, Hernandez
has not alleged that the IIT “students enrolled in the tradi-
tional on-campus program paid higher tuition and fees than
students enrolled in [IIT’s] online program.” Gociman, 41 F.4th
at 885. But the public-facing price differential for in-person
versus online courses was only one of several factors that we
held supported the students’ claim that Loyola had made an
implied promise to provide in-person, on-campus instruc-
tion. And we note that, while Hernandez does not allege a
price difference in the methods of instruction, he does claim
that IIT treated its online courses as “separate and distinct
products.” That is easy to see in other contexts. For example,
a person who contracted to buy an all-electric car would not
accept delivery of a conventional internal-combustion model
even if the price, size, and other amenities were identical. And
in any event, we did not assign dispositive weight to Loyola’s
pricing system in Gociman, and we decline to do so here.
 We recognize that there are many cases similar to this one
and Gociman. Some will survive a motion to dismiss, and oth-
ers will not. Breach-of-contract claims demand fact-specific
inquiries. Our analysis should not be read to imply that in-
person instruction and physical campus access are implied
terms of every student-university contract. Even before the
pandemic, schools had different practices for online pro-
grams. Afterwards, some may have rebated certain fees that
were limited to on-campus activities; and virtually all have
revamped their policies and programs going forward.
10 No. 22-1741

 Having found that Hernandez has sufficiently alleged
breach of an implied contract, we turn to IIT’s other argu-
ments in support of dismissal: that the claims are foreclosed
by its refund policy and by Illinois’s bar on educational mal-
practice claims.
 B. Tuition-Refund Policy and Bulletin Disclaimer
 IIT argues that its tuition-refund policy bars Hernandez’s
claims because, with a few narrow exceptions, the policy
states that IIT retains “sole discretion” regarding whether to
issue refunds. IIT also cites to the foreword to its 2019–2020
course catalog, which states that “information in this bulletin
is subject to change without notice,” to argue that it retains
unfettered discretion to eliminate in-person instruction.
 Whether the tuition-refund policy and course-catalog dis-
claimer, “which do[ ] not expressly refer to emergencies or
other force majeure events, reasonably appl[y] to the pan-
demic,” and whether IIT exercised the discretion it purports
to have in accordance with the parties’ reasonable expecta-
tions are questions better suited for a later time when there
has been further factual development. Gociman, 41 F.4th at
884. “At this stage of the case however, the possibility of a ge-
neric disclaimer does not overcome a reasonable inference”
that IIT agreed to provide in-person instruction and access to
campus facilities in exchange for tuition and fees. Id.
 C. Educational Malpractice
 IIT also argues that Hernandez’s claims fit better under the
rubric of educational malpractice. “Educational malpractice”
is an imprecise term that has been applied to a variety of dif-
ferent complaints against educational institutions. Typically,
“a plaintiff asks a court to evaluate the course of instruction
No. 22-1741 11

or the soundness of a method of teaching that has been
adopted by an educational institution.” Gociman, 42 F.4th at
882. Illinois, like nearly every other state, has never recog-
nized any such claim. See Waugh v. Morgan Stanley & Co., 2012
IL App (1st) 102653, ¶ 42 (collecting cases from various juris-
dictions and concluding that “claims sounding in educational
malpractice … are not cognizable in Illinois”); Ross v.
Creighton Univ., 957 F.2d 410, 415 (7th Cir. 1992) (discussing
the educational malpractice doctrine and concluding that “the
Illinois Supreme Court would refuse to recognize the tort of
educational malpractice”).
 Relatedly, Illinois courts have held that universities must
be afforded significant deference when students sue because
of “adverse academic decision[s]” such as rejections, expul-
sions, and dismissals. Raethz v. Aurora Univ., 346 Ill. App. 3d
728, 732 (Ill. App. Ct. 2004). These suits often allege that a uni-
versity has breached its contract with the student by expelling
or declining to admit the student. Unlike classic educational
malpractice claims, Illinois courts have not completely barred
students from bringing these suits. But because of the policy
concerns involved in second-guessing a university’s aca-
demic judgment, a student bringing such a claim must show
that the adverse academic decision “was made arbitrarily, ca-
priciously, or in bad faith.” Id. (emphasis omitted) (citing
Frederick v. Northwestern Univ. Dental Sch., 247 Ill. App. 3d 464,
471 (Ill. App. Ct. 1993)); accord Bosch, 2019 IL App (1st)
190070, ¶ 34; Seitz-Partridge v. Loyola Univ. of Chi., 409 Ill. App.
3d 76, 82 (Ill. App. Ct. 2011); Brody v. Finch Univ. of Health Scis./
Chi. Med. Sch., 298 Ill. App. 3d 146, 156 (Ill. App. Ct. 1998).
 Hernandez’s claims do not fall within either category. He
asks us neither to rule that the online education he received
12 No. 22-1741

was inadequate to prepare him to work in his chosen field of
I.T. Management nor to review IIT’s academic decisions about
his performance. In fact, just as in Gociman, Hernandez’s
claims do not require us to evaluate the university’s academic
or educational judgment at all. 41 F.4th at 882–83. Rather, Her-
nandez asserts that he received “a materially different prod-
uct” than what he bargained for. Just as a student may rea-
sonably choose to attend College X over College Y without
calling into question the quality of College Y’s academic of-
ferings, so too might a student choose in-person over online
education.
 The Fifth Circuit recently took a similar approach in an-
other pandemic case: “Deciding whether [a university]
breached its agreement to provide in-person instruction and
on-campus access to facilities in exchange for pre-paid tuition
and fees does not implicate educational questions best left to
professional academic judgment.” Jones v. Administrators of
Tulane Educ. Fund, 51 F.4th 101, 110 (5th Cir. 2022). In sum, the
deference accorded to a university’s academic decisions plays
no necessary part in a claim such as Hernandez’s, and so the
educational malpractice doctrine does not figure in our anal-
ysis. See Gociman, 41 F.4th at 882.
 Nothing we say here should be taken as a comment on the
merits of Hernandez’s case. He may be unable to prove dam-
ages in a manner that does not collapse into education mal-
practice. But it would be inappropriate to speculate on later
developments. We agree with our colleagues on the Fifth and
D.C. Circuits that “[w]ith discovery, the students may be able
to support a calculation of damages based not on any subjec-
tive evaluation of the quality of the online instruction re-
ceived but on metrics such as [the university’s] preestablished
No. 22-1741 13

disparate pricing of in-person and online instruction or on
market value.” Jones, 51 F.4th at 110; accord Shaffer v. George
Washington Univ., 27 F.4th 754, 765 (D.C. Cir. 2022) (rejecting,
at the motion to dismiss stage, a university’s argument that
student plaintiffs failed to allege cognizable damages because
damages would necessarily require the court to evaluate the
quality or value of the education students received).
 D. Unjust Enrichment
 Finally, Hernandez pleads in the alternative that IIT was
unjustly enriched at the students’ expense when it retained
the entirety of their tuition and fee payments while it simul-
taneously (1) saved significant sums of money in operating
and staffing costs, and (2) received emergency federal aid.
 To state a claim for unjust enrichment under Illinois law,
“a plaintiff must allege that the defendant has unjustly re-
tained a benefit to the plaintiff’s detriment, and that defend-
ant’s retention of the benefit violates the fundamental princi-
ples of justice, equity, and good conscience.” HPI Health Care
Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 160 (Ill.
1989). But a plaintiff may not recover under an unjust enrich-
ment theory if there is an enforceable contract that governs
the relevant subject matter. Gociman, 41 F.4th at 886 (citing
Guinn v. Hoskins Chevrolet, 361 Ill. App. 3d 575, 604 (Ill. App.
Ct. 2005)). Normally this rule makes sense. If a defendant has
fulfilled her obligations under a valid contract with the plain-
tiff, then she cannot be said to have acted “unjustly” to the
plaintiff’s detriment. And if the defendant has not fulfilled her
obligations under a valid contract with the plaintiff, then the
plaintiff has a remedy at law for breach. Either way, the equi-
table remedy of unjust enrichment is inapplicable.
14 No. 22-1741

 Nonetheless, not every case involving a contract claim is
clear cut, especially at the pleading stage. To create breathing
room in such circumstances, we have recognized that plain-
tiffs may plead contract claims and unjust enrichment in the
alternative. See, e.g., Mashallah, Inc. v. W. Bend Mut. Ins. Co., 20
F.4th 311, 325 (7th Cir. 2021); Cohen v. Am. Sec. Ins. Co., 735
F.3d 601, 615 (7th Cir. 2013). This allows plaintiffs to proceed
in situations where “the validity or the scope of the contract
is difficult to determine, or if the claim at issue falls outside
the contract.” Gociman, 41 F.4th at 887. This does not condone
half-baked or legally insufficient allegations of unjust enrich-
ment. To survive a motion to dismiss, the plaintiff must still
“give enough details about the subject-matter of the case to
present a story that holds together.” Swanson v. Citibank, N.A.,
614 F.3d 400, 404 (7th Cir. 2010). Furthermore, plaintiffs may
not “incorporate by reference allegations of the existence of a
[valid] contract between the parties in the unjust enrichment
count,” because this would seek relief that Illinois does not
offer. Gociman, 41 F.4th at 887.
 This was the misstep taken by the Gociman students, who
inadvertently “incorporated by reference allegations of the
existence of a contract between the parties.” Id. We held that,
but for this pleading error, the students had adequately stated
a claim for unjust enrichment. Id. Because plaintiffs are gener-
ally “entitled to at least one chance to amend their complaint
to cure an error in response to a district court’s dismissal or-
der unless amendment would be futile or otherwise unwar-
ranted,” we gave the students an opportunity to amend their
complaint. Id.
 IIT argues that Hernandez has fallen into the same trap as
the Gociman students, because the unjust enrichment counts
No. 22-1741 15

in his complaint incorporate by reference “all preceding alle-
gations as though fully set forth herein.” That would include
the contract allegations in the breach-of-contract counts. The
district court agreed. Because it already had afforded Hernan-
dez one opportunity to amend, it granted IIT’s motion to dis-
miss the unjust enrichment allegations.
 There is a critical difference, however, between the Goci-
man complaint and Hernandez’s complaint: Hernandez ex-
pressly states that the unjust enrichment claim “is pled in the
alternative to, and to the extent it is determined a contract does not
exist or otherwise apply, the contract-based claim set forth in the
First Cause of Action above.” Likewise, his unjust enrichment
claim on behalf of the putative Fees Class states that “[t]his
claim is pled in the alternative to, and to the extent it is deter-
mined a contract does not exist or otherwise apply, the contract-
based claim set forth in the Fourth Cause of Action.”
 Hernandez’s round-about way of resolving the pleading
issue certainly is not a model to be emulated. Nevertheless,
we find that this language is sufficient under Rule 8—even if
barely so—to assure that Hernandez is not entering the for-
bidden territory of asserting the existence of an enforceable
contract as a component of his unjust enrichment claim. See
Johnson, 574 U.S. at 11 (federal pleading rules are designed “to
discourage battles over mere form of statement” and “to
avoid civil cases turning on technicalities”).
 Hernandez alleges that IIT “unjustly retained” the benefit
of students’ full tuition and fees while it simultaneously “re-
ceived significant aid from the federal government” and
“saved significant sums of money” by “operat[ing] a remote,
on-line campus [rather] than a fully open physical campus.”
This is sufficient to state a claim for unjust enrichment. See
16 No. 22-1741

Gociman, 41 F.4th at 887 (holding that students adequately
pleaded an unjust enrichment claim where they “allege[d]
that they paid tuition for an in-person educational experience,
which the university failed to provide though it retained the
benefit of tuition”).
 III
 We REVERSE the decision of the district court and REMAND
for further proceedings consistent with this opinion.
No. 22-1741 17

 ST. EVE, Circuit Judge, concurring. I recognize that Gociman
v. Loyola University of Chicago, 41 F.4th 873 (7th Cir. 2022), is
the law of the circuit and join the Court’s opinion based on
the reasoning of that case. I write separately to reiterate my
belief that Gociman was wrongly decided. Although not ex-
plicitly delineated, Illinois state courts have historically rec-
ognized two distinct types of implied contracts between stu-
dents and schools: “speciﬁc promise” implied contracts and
“fundamental promise” implied contracts. Id. at 888–89 (St.
Eve, J., concurring). The Court’s opinion in Gociman conﬂates
the two categories, recognizing “fundamental promise” con-
tracts outside the matriculation and graduation contexts in
which they were created. Id. at 891–92. As a federal court sit-
ting in diversity, it is not our place to expand the limits of state
law. Id.
18 No. 22-1741

 KIRSCH, Circuit Judge, concurring. I recognize that Gociman
v. Loyola University of Chicago, 41 F.4th 873 (7th Cir. 2022), is
controlling and join today’s opinion not because I think Goci-
man was correctly decided, but based on that binding prece-
dent. The majority in Gociman did not certify this important
question to the Illinois Supreme Court, and now it’s too late
to do so. Nat’l Cycle, Inc. v. Savoy Reinsurance Co., 938 F.2d 61,
64 (7th Cir. 1991) (“[T]he right time to certify a question is be-
fore the first federal decision on the point. Certification elim-
inates the need to expend judicial resources predicting how
another court will decide a question. Once we have invested
the time and effort to make the prediction, the costs have been
sunk.”); see also Barnes v. Anyanwu, 391 F. App’x 549, 554 (7th
Cir. 2010) (declining to certify a question because “in this cir-
cuit at least, it is resolved”). I urge the Illinois courts—the final
arbiters of Illinois law—to take up and decide this issue as
quickly as the opportunity affords.